UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GLENN G. JONES,

        Plaintiff,

    v.                                          CASE NO.  8:03-CV-1145-T-17MAP

U-HAUL CO. OF FLORIDA

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action charging discrimination in the workplace.  Plaintiff, an African–American who worked for U-Haul for almost ten years, claims U-Haul fired him because of his race, disability, and in retaliation for complaining about a racially-motivated incident directed against him by a fellow worker.  U-Haul, on the other hand, asserts it terminated Plaintiff because he failed to meet the minimum job demands of his position.  In its motion for summary judgment, U-Haul argues Plaintiff cannot make out a *prima facie* case and, alternatively, Plaintiff has not contradicted its proffered legitimate reasons for firing him (doc. 14).  After reviewing the summary judgment record, I agree and recommend the district judge grant U-Haul's motion.[1]

   *A.  Standard of Review*

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The existence of

---

[1] United States District Judge Elizabeth A. Kovachevich referred this matter to me pursuant to 28 U.S.C. § 636 and Local Rule 6.01(b). (doc. 29).

some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor. *Anderson,* at 255.

B. *Facts*

The material facts are not particularly in dispute. U-Haul first employed Plaintiff in 1993 as a customer service representative. Over the years the company presented him with numerous performance awards and advanced him within the organization. In 1998, and by then the general manager of the Lakeland U-Haul moving center, Plaintiff approached his superior, John Thompson, and asked to be considered for the position of area field manager (AFM). Thompson had overall managerial responsibility for the West Florida region and supervised six AFMs. Thompson interviewed the Plaintiff and hired him for the job.

An AFM supports and trains the individual dealers on his route about promotional and accounting procedures. He also performs preventive maintenance on rental equipment. One of the tasks of the job is to prepare and submit Dealer Service Reports (DSRs) on the dealers so that U-Haul can evaluate that dealer's performance. These dealer-operators are independent businesses and not employees of U-Haul. At a minimum, according to U-Haul (*see* doc. 13 at ¶ 6), an AFM must satisfy these standards:

"1) perform a complete, thorough, and quality DSR on each dealer in his assigned route every 60 to 90 days, performing a minimum of 12 DSR's per month, 2) prepare, up-date, and maintain the DSR and dealer-related reports, forms, and documentation in dealer folders that

2

were to remain in his company issued truck, and 3) timely submit DSR information to the U-Haul company in Phoenix, Arizona within 30 days from the date he performed the DSR."

Prior to 2002, AFMs entered DSR information in a computer at an assigned location.  But in early 2002 that changed when U-Haul implemented a PalmPilot project which allowed the AFM to upload DSR data to the Sarasota marketing office.  However, if the AFM preferred, he could still use his personal computer and send the data to Sarasota via the internet.  Plaintiff used this latter option until lightning damaged his computer shortly before his termination.  Importantly, irrespective of the duty to electronically enter the data, U-Haul still expected the AFM to keep a paper record in the dealer folder.

From May 1999 to July 2002, Thompson verbally and in writing reprimanded Plaintiff repeatedly for failing to meet the expected standards set for the position.  Much of Thompson's frustration dealt with the Plaintiff's failure to meet U-Haul's DSR requirements, but that was not Thompson's only concern.  The summary judgment record shows a distinct pattern of conduct by Plaintiff and a consequent effort by his supervisor to discipline and remedy the perceived deficiencies.  Thompson discovered problems with Plaintiff's performance, Thompson confronted Plaintiff, Plaintiff improved for a time, then Plaintiff slid back only to be warned again.  *See* doc. 18-2, exhibits A-F.

In May 1999, Thompson discovered Plaintiff had not prepared DSR reports for the "last couple of months"; yet, he had inserted dealer codes during the period thereby qualifying for monthly bonuses.  Thompson found this unacceptable.  Not only did Thompson instruct Plaintiff that he should complete a DSR for every dealer he serviced, Thompson noted that Plaintiff's reporting of codes while omitting his other duties "could be misconstrued" as falsifying information.

3

Six months later, Thompson confronted Plaintiff again for failing to document files with the required DSRs and other paperwork. Thompson specifically warned: "Be notified that timely filing of paperwork is a mandatory requirement of the AFM job and is also a prerequisite for certification. Failure to continue to perform these functions is grounds for Demotion or Termination." *See* doc 18-2 at ex. B. Plaintiff improved for a time but eventually returned to the same pattern.

In September 2001, Thompson discovered seventeen of Plaintiff's dealer folders missing and no DSRs for the previous month. Again Thompson cited Plaintiff but this time reduced his workload to help him meet minimum performance standards.[2] Plaintiff improved and received a raise in March 2002. But by July 2002 when Thompson audited Plaintiff's performance, Thompson found that Plaintiff had not submitted DSRs for over two months and was either the lowest AFM or the next to last in certain performance categories. Thompson issued another written warning, this time with more emphasis – "consider this a serious warning of poor performance (doc. 18-2, ex. D).[3] Not long after this last warning, Thompson concluded Plaintiff had not improved and had blatantly ignored the DSR requirements. Thompson fired Plaintiff on September 7, 2002 (doc. 18-1, Thompson affidavit at ¶ 39).

Plaintiff essentially concedes he did not submit DSR information or include DSR papers in dealer folders as Thompson verbally and in writing had demanded. Yet, he excuses his failure with a variety of reasons: lack of internet access, lack of computer access, U-Haul's implementation of

---

[2] Plaintiff claims that Thompson reduced his workload in an effort to hurt his sales rankings and negatively affect his performance. However, he presents no evidence of this allegation other than his opinion.

[3] Plaintiff says his PalmPilot needed repair during this time period; but he concedes he did not go to either Sarasota or Lakeland to prepare his reports in the interim. Instead, he waited several weeks for the repair of his PalmPilot.

the PalmPilot program before insuring that proper transmission could be made by all AFMs, or the unreasonableness of traveling to a faraway location to input data. And, in large measure, he questions the essentialness of DSR reporting to the job. While he admits that meeting the DSR demands is "certainly an important function of the job," he contends it "is not one of the most important responsibilities of an AFM." *See* Plaintiff's affidavit at doc. 26-3 at ¶ 2. Besides, Plaintiff emphasizes he admirably performed all the AFM's other duties, a factor U-Haul should have considered before it fired him.[4]

### C. Discussion

Plaintiff's arguments about discrimination when cut to their core rest on four premises: (1) Thompson treated white workers more leniently; (2) he had an exemplary record with U-Haul as evidenced by his numerous performance awards; (3) Thompson fired him after he complained about a co-worker's defacing his vehicle with a racial epithet; and (4) he believes, particularly having considered the three previous premises, that Thompson's stated reasons for firing him are pretextual. None of these premises support his claims as a matter of law for a number of reasons.

### 1. disparate treatment and comparators

In reviewing circumstantial evidence cases under Title VII cases like this one, the Eleventh Circuit applies the familiar *McDonnell Douglas/Burdine* three-step burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Knight v. Baptist, Hosp. of Miami, Inc.,* 330 F.3d 1313, 1316 (11th

---

[4] Conversely, U-Haul contends that DSR compliance was a condition of an AFM's employment and they present two bulletins that stress DSR importance. A management bulletin issued before Plaintiff ever received a written warning discusses DSR objectives and procedures. A policy bulletin sent after Plaintiff's first warning but before his second addresses the AFM job description including performing 12 DSRs per month.

Cir. 2003); *Silvera v. Orange County School Bd.,* 244 F.3d 1253, 1258 (11th Cir. 2001). Accordingly, to make a *prima facie* case of disparate treatment, the Plaintiff must show: (1) he is a member of a protected group; (2) he suffered an adverse employment decision; (3) he was qualified for the position from which he was rejected or terminated; and (4) the employer treated similarly-situated employees outside of Plaintiff's protected class more favorably. *Knight,* 330 F.3d at 1316 citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). If the Plaintiff satisfies this hurdle, U-Haul then must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Silvera,* 244 F.3d at 1258 quoting *Burdine,* 450 U.S. at 253. The Plaintiff, if U-Haul so responds, may then attempt to show the proffered reason was merely a pretext for the company's actions. *Id.*

Where a plaintiff contrasts his treatment with a co-worker's experience, the Eleventh Circuit consistently reminds courts to look for relevant and meaningful comparisons. In other words, courts should ensure "apples [are] compared to apples." *Silvera,* 244 F.3d at 1259 (citing other Eleventh Circuit cases). When comparing disciplinary actions between comparators, the most important factors are the nature of the offenses and the nature of the punishments imposed. Here, in order to satisfy the similar offenses prong, "the comparator's misconduct must be nearly identical to the plaintiff's in order to 'prevent the courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id* quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999). This means not just evaluating the specific disciplinary action at issue but also examining the worker's comparative disciplinary histories. *Id* (plaintiff and comparator not similarly situated because plaintiff had more arrests than comparator); *see also Knight v. Baptist Hosp. of Miami, Inc.,* 330 F.3d 1313, 1317 (11th Cir. 2003) (affirming district court's summary judgment for employer

6

where plaintiff compared herself to co-worker and plaintiff's history of disciplinary problems was "substantially worse" than co-worker).  In other words, a plaintiff must show he is similarly situated in all relevant aspects to the non-minority employee.  *Id*.  In this case, Plaintiff fails to meet that burden.

Without personal knowledge nor evidence to support his contentions, Plaintiff identifies John Traub, Matthew Strawder and Robert Sherman as similarly-situated, non-minority, non-disabled co-workers.  Plaintiff claims that these individuals received demotions or transfers, rather than terminations, when they had discipline problems.  U-Haul counters that Traub, Strawder and Sherman did not have DSR compliance issues and are thus not similarly situated.  Traub wrote personal checks and cashed them from the store's cash drawer.  These checks bounced.  Matthew Strawder was in total compliance with his DSR requirements as was Robert Sherman.  In addition, Thompson recalls terminating Joseph Crider and Harley Backstrum, white, non-disabled AFMs, for less severe compliance problems than Plaintiff.  In fact, both of them received fewer warnings before their termination than Plaintiff (doc. 14, p. 5).  In short, none of these workers satisfy the Eleventh Circuit's consistent standard for relevant and meaningful comparators.

### 2.  *prima facie requirements, pretext, and disability*

Plaintiff's efforts at satisfying the *prima facie* test and his claims about pretext ignore key undisputed facts and their justifiable inferences: he failed to meet the job requirements Thompson and U-Haul expected and warned him about; Thompson hired him and fired him; and Thompson replaced him with an African-American.  These facts negate Plaintiff's ability to successfully meet the traditional burden-shifting framework used in discrimination cases like this.

As U-Haul points out, qualification for the position is a prong of the *McDonnell Douglas*

analysis.  Whatever his stated reasons, Plaintiff continually failed to meet Thompson's standards; indeed, Plaintiff admits he did not satisfy the minimum DSR requirements (doc. 13, p. 7).  Further, he presents no evidence that Thompson and U-Haul's claims about poor job performance are erroneous.  What Plaintiff essentially falls back on is his opinion that he could do the job.  But his belief without more is not enough to meet the *prima facie* test nor discount his employer's reasons for terminating him.  *Standard v. A.B.E.L.Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998) ("The pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs").

Plaintiff maintains Thompson had alternatives available other than firing him.  Perhaps, but as the Eleventh Circuit emphasizes – a reviewing court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Alphin v. Sear, Roebuck, and Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991)(citations omitted).  The Plaintiff may have been a stellar worker at other positions.  Thompson could have demoted him or transferred him.  All that is not relevant here.  The critical issues are whether Thompson fired the Plaintiff because of his race, or disability, or his engaging in protected activity, or all of the above.

That Thompson replaced him with another member of the same protected class (Sterling Crump) effectively counters Plaintiff's claim that Thompson acted with discriminatory animus.  *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 983-84 (11th Cir. 1989) (a discharged employee's replacement is an effective gauge of intent because a company's hiring practices may reveal its underlying motivation).  This inference is even more convincing here because Thompson, at the time of Crump's promotion, did not know about Plaintiff's claims of discrimination. *See Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th  Cir. 1998) (agreeing with other circuits that where the

same individual both hired and fired an employee, a permissible inference arises that the employers'

stated justification for terminating the employee is not pretextual).

Plaintiff's claims that Thompson discriminated against him because of his disability (he

asserts that he has a permanent and total disability to his left arm"visable upon immediate

appearance"), suffer similar problems to his Title VII claims.  To establish a *prima facie* case under

the ADA, Plaintiff must prove the he (1) has a disability, (2) is a qualified individual, and (3) was

discriminated against because of his disability.  *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130,

1132 (11th Cir. 1996).  Assuming that Thompson even regarded him as being disabled, Thompson

knew about his disability when he hired him.  Plaintiff never asked for any accommodations, does

not contend he needed any to do the job, and does not allege that his impairment caused him to be

unable to upload DSR information or meet any of the other documentary demands of the position.

Simply put, Plaintiff's disability claim rests solely on the fact he is impaired.  He offers no proof that

U-Haul acted with any discriminatory animus because his of his arm.  On the contrary, the fact that

U-Haul promoted him and recognized his performance in other positions demonstrates that U-Haul

did not discriminate against him because of his impairment.

### 3.  retaliation

Plaintiff grounds his retaliation claim on two events that occurred a year apart: a co-worker's

vandalizing his company vehicle in July 2001 by painting a racial epithet and a letter he sent to the

Area Vice President in June 2002 expressing interest in a promotion.  From this Plaintiff

extrapolates that with each warning after these events Thompson somehow acted with

discriminatory intent.  As Plaintiff tells it, complaining "about my truck placed me on Thompson's

'radar screen.'"  *See* Jones affidavit at doc. 26-3, ¶ 15.  Presumably, what the Plaintiff really means

is if he had not complained about the slur Thompson would never had cited him for his AFM shortcomings.  These arguments do not justify his retaliation claim for a variety of reasons.[5]

As U-Haul points out, derogatory remarks by non-decision makers do not constitute evidence of discrimination.  *Standard* at 161 F.3d 1329-1331.  Clearly, Plaintiff offers no evidence that Thompson participated in the truck incident or that the accused co-worker had any input whatsoever in Plaintiff's disciplinary actions.  Thompson took quick action when Plaintiff reported the event and Plaintiff apparently made no other complaints  about racial mistreatment.

Plaintiff arguments also fail for other reasons.  To establish a *prima facie* case of retaliation, Plaintiff must show that (1) he engaged in statutorily protected expression; (2) his employer knew about that activity; (3) he suffered an adverse employment action; and (4) there is some causal relation between the two events.  *Maniccia, supra,* 171 F.3d at 1364. The second event, Plaintiff's request for promotion, is not a "protected activity."   And he fails to show that either of these events are connected or causally related to his termination.  *Maniccia,* 171 F.3d 1369 (no causal connection given delay of fifteen months between protected activity and adverse employment action).  *See also, Valdez v. Mercy Hospital*, 961 F.2d 1401, 1403 (8th Cir. 1992) (no causal connection when employee terminated six months after protected activity); *Breech v. Alabama Power Company*, 962

---

[5] For purposes of this motion, the Court assumes someone vandalized the Plaintiff's truck with a crude racial slur, but some further comment is warranted to place the Plaintiff's claims in perspective. The parties apparently dispute the existence of a racial epithet. Undoubtedly, the Plaintiff, having returned from his vacation, reported to Thompson that someone had removed the ramps to his truck and painted a racial remark on one of the ramps.  Thompson inspected the ramps, could not see any writing, but observed they had been painted black.  Because the Plaintiff had said that Rick Springer had taken the ramps, Thompson confronted Springer, who was another AFM like Plaintiff.  Springer indeed admitted taking the ramps but denied painting any racial slur.  Regardless, Thompson cited Springer in writing for unprofessional or unacceptable behavior.  *Compare* Jones affidavit (doc. 26-3) at ¶ 10 with Thompson affidavit (doc. 18-1) at ¶s 733-74.

F. Supp. 1447 (S.D. Ala. 1997) (more than a year passed between protected activity and discharge and was thus not temporally close enough to support inference of causal connection), *aff'd*, 140 F.3d 1043 (11th Cir. March 20, 1998); *Balletti v. Sun-Sentinel Co.,* 909 F. Supp. 1539, 1549 (S.D.Fla. 1995) (elapse of six months between grievance and discharge did not permit inference of causal connection). Plaintiff simply fails to make a showing the two events are related.

### 4. *negligent training, supervision, and retention*

Lastly, Plaintiff claims U-Haul failed to properly train and supervise its employees with regard to discrimination and retaliation policies and procedures (doc. 1 at count IV). Notably, the Plaintiff fails to specify what U-Haul did or should have done regarding any training or supervision. He also omits any reference to U-Haul's failure to train or supervise. Presumably, by incorporating "the general allegations set forth above" in his complaint, Plaintiff premises this cause of action on two events: the racial slur he states he discovered and Thompson's purported retaliatory actions when Plaintiff sought a promotion. For the reasons already stated here, Plaintiff's arguments are without merit.

To prevail on a claim of negligence Plaintiff must establish "(1) the employer was on notice of the potentially harmful propensities of the employee; (2) plaintiff was within the zone of foreseeable risks created by the employment; and (3) the employer's breach of duty was the proximate cause of plaintiff's injuries." *Ahern v. Odyssey (London) Ltd.*, 788 So.2d 369, 372 (Fla. Dist. Ct. App. 2001). Plaintiff offers no factual basis to support his claim. The summary judgment record reveals only the one racially charged incident. When Plaintiff brought it to Thompson's attention, Thompson immediately confronted the matter and reprimanded the suspected worker. No other like instances followed, certainly Plaintiff fails to point to any committed by the employee

Thompson counsel and disciplined.  He offers nothing showing Thompson was unfit, or that U-Haul knew or should have known Thompson was unfit.

     *C.  Conclusion*

     Whether one analyzes Plaintiff's claims at the *prima facie* stage or at the pretext stage, Plaintiff offers scant proof that Thompson or U-Haul discriminated against him because of race or disability.  U-Haul's proffered nondiscriminatory reasons for its actions requires this Court to focus its inquiry.  *Silvera* , 244 F.3d at 1258.   Has the Plaintiff cast doubt that U-Haul's "legitimate reasons were not what actually motivated its conduct?"  *Id* (quoting *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).  He has not.  His proof about discrimination is opinion.  And the Eleventh Circuit has held that conclusory, self-serving or uncorroborated allegations by a plaintiff will not create an issue of fact sufficient to defeat a well-supported summary judgment motion.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

     U-Haul accurately summarizes a court's perspective here: an employer may discipline or discharge a minority employee "for a good reason, bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *Nix v. WLCY Radio/ Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984).  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's manager," the law does not interfere unless the business acted with illegitimate motives. *See Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*) (citations omitted).  For all these reasons, it is hereby

     RECOMMENDED:

     1.     U-Haul's Motion for Summary Judgment (doc. 12) be GRANTED.

IT IS REPORTED at Tampa, Florida on July 21, 2005.

*Mark A. Pizzo*

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc: Counsel of Record